Filed 3/27/23 English v. Noel Jones Ministries CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| TONTANISHA ENGLISH et al., | B312959 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 20STCV06808) |
| v. | |
| NOEL JONES MINISTRIES, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Cary Nishimoto, Judge.  Affirmed.

Gansen Law Group and Christopher J. Gansen, for Plaintiffs and Appellants.

Fozi Dwork & Modafferi, Golnar J. Fozi and Michael V. Storti, for Defendants and Respondents.

Patricia Harrison's ex-boyfriend, Kevin Dickson, fatally stabbed Harrison in the parking lot of City of Refuge Church (Church). Harrison's heirs sued City of Refuge Ministries, Inc. and Noel Jones Ministries, Inc. (hereafter collectively Ministries), which operated and managed the Church, Noel Jones, the bishop and chief executive officer of Ministries, and Bryant Smith, the head of Church security (hereafter collectively Ministry defendants), for wrongful death, negligence, and related causes of action.[1] The trial court sustained the Ministry defendants' demurrers to the first amended complaint without leave to amend and entered judgment in their favor.

Harrison's heirs contend the trial court mistakenly concluded that the Ministry defendants did not owe a legal duty to Harrison to maintain security guards adequate to have prevented her attack or to exclude Dickson from the Church. Because we agree with the trial court, and further conclude that Harrison's heirs have not demonstrated how the complaint can be amended to establish such duties, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Background

"This case comes to us at the demurrer stage, so for present purposes we assume the truth of the allegations in the complaint." (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 209–210 (*Brown*).) " '[W]e treat as true all material facts properly pleaded, but not contentions, deductions or conclusions

---

[1] Dickson was also named as a defendant in the lawsuit. He is not a party to this appeal.

of fact or law.' " (*Hanouchian v. Steele* (2020) 51 Cal.App.5th 99, 103 (*Hanouchian*).)

The Ministries owned and operated the Church and the premises where the Church was located, including its parking lot. Defendant Jones was the bishop and chief executive officer of the Ministries. Defendant Smith was the head of Church security. The Church employed a 15-person security staff.

Both Harrison and Dickson were members of the Church at the time of the incident. Harrison had been an active member of the Church for more than five years before her death. Harrison attended weekly services, which drew more than 4,500 members, she attended bible study classes, which drew about 300 members, and she volunteered at Church-sponsored community events and activities. At the time of the fatal stabbing, Dickson was Harrison's ex-boyfriend.

The first amended complaint alleges that their relationship ended "badly, with violence on Dickson's part and [Harrison's] seeking a restraining order against him." Both Smith and Jones "had intimate knowledge of [the relationship between Dickson and Harrison] and of Dickson's abusive, harassing, and threatening conduct towards [Harrison] prior to the incident." For example, two months prior to the incident, "Dickson admitted to Smith that [Harrison] had accused him of 'choking her out' and that the authorities had to be called." Dickson further informed Smith that as a result of that incident "there was an active restraining order against Dickson in favor of [Harrison]." "Smith casually told Dickson to 'leave her alone' and that there were 'more fish in the sea.' "

Jones and Smith were also informed about one occasion when Dickson harassed Harrison while she was volunteering at

the Church. As a result of that incident, "a report was made to the Ministries, Jones and Smith explicitly instructing" that "they 'had to look out for the two of them having problems.' "

According to the first amended complaint, "[n]one of the Defendants took any additional steps to assist [Harrison] with her personal safety via-à-vis the Church, nor did they ask or inform Dickson that he was no longer invited at the Church, or take any steps to keep Dickson and [Harrison] from interacting on their property." The first amended complaint further alleges that the "Ministries, Jones and Smith had knowledge of the high foreseeability that violent crime specific to Dickson could and would occur on the premises, thus establishing a duty to provide increased security to members of their congregation such as [Harrison] and prevent Dickson from accessing their premises at all." Such measures could have included providing "additional or personal security."

On April 18, 2018, at approximately 7:00 p.m., Dickson arrived at the Church parking lot and used his car to block Harrison's car from leaving. After confronting Harrison for several minutes in the parking lot, Dickson stabbed Harrison repeatedly.

Harrison's granddaughter, who was in Harrison's car and witnessed the attack, ran inside the Church and told a member of the Church's security staff. The security guard then notified Smith, who was inside the Church's sanctuary awaiting the arrival of Jones for a bible-study session. Upon being notified of the attack, Smith exited the back door of the Church into the parking lot and observed Dickson drive away. When Smith got to Harrison, she was bleeding from multiple stab wounds. Church members had already called 911. Harrison died from the attack.

4

## II. Trial court proceedings

Harrison's heirs Tontanisha English, Ashley Harrison, Eleseia Viverette, and Lailah Hardie (hereafter collectively English) filed a first amended complaint against the Ministry defendants and Dickson, alleging claims for wrongful death, negligence, negligent hiring, supervision, and retention, intentional infliction of emotional distress, and negligent infliction of emotional distress.

English's wrongful death claim alleged that the Ministry defendants negligently operated and supervised the Church parking lot on the day of Harrison's murder "by failing to take action in response to the numerous warnings that Dickson presented a threat" to Harrison, "such as banning him from Church premises."

English's negligence claim similarly alleged that the Ministry defendants "had a duty to use reasonable care to secure, safeguard and protect" Church members, including Harrison, and breached that duty "by failing to take reasonable steps to ensure the safety" of Harrison "despite being on notice that Dickson had been violent towards her" in the past. The first amended complaint alleged that such "reasonable steps" included banning Dickson from the premises or posting a "security detail in the Church's parking lot" to ensure parishioners could safely enter and exit the Church.

The first amended complaint also sought punitive damages.

The Ministry defendants filed demurrers to the first amended complaint and motions to strike the punitive damages allegations.

In their demurrer to the wrongful death and negligence claims, the Ministry defendants argued that they did not owe

5

Harrison a legal duty to prevent Dickson's violent attack. They contended that the only level of security that could have prevented the attack "would have been something approaching personal security for every parishioner attending a Church service or event," and that the "level of security necessary to protect up to 4,500 parishioners would be immensely burdensome for" them. They further argued that banning Dickson from the Church would have been ineffective given there already was a restraining order preventing him from making contact with Harrison. Last, they highlighted that the "level of foreseeability of intentional, targeted, violent assaults on the Church premises is practically nil."

In their motions to strike, the Ministry defendants contended that the first amended complaint's request for punitive damages against the Ministries was barred by Code of Civil Procedure section 425.14. That section bars a claim for punitive damages "against a religious corporation . . . unless the court enters an order allowing an amended pleading that includes a claim for punitive damages" to be filed. (Code Civ. Proc., § 425.14.) They further argued that the first amended complaint failed to allege facts sufficient to show "oppression, fraud or malice" on the part of the Ministry defendants.[2]

In opposition to the demurrers, English contended that the first amended complaint alleged that the Ministry defendants knew about Dickson's "violent propensities, and that his conduct

---

[2] Only the motion to strike of Noel Jones Ministries, Inc. is included in the clerk's transcript. The Ministry defendants inform us that the other motions to strike are identical in all material respects.

6

in stabbing her to death violently was foreseeable" to them. English also reiterated the allegation in the first amended complaint that the Church's security staff "did nothing to try to 'keep them apart,' nor did they take any reasonable actions to prevent Dickson from harming [Harrison] at the Church, including additional or personal security." English also requested leave to amend in the event the court sustained the demurrers, but did not identify the specific allegations she could offer in an amended complaint.

In opposition to the motions to strike, English conceded the applicability of Code of Civil Procedure section 425.14. Even so, she argued the allegations in the first amended complaint were sufficient to state a punitive damages claim. In particular, she argued that the Ministry defendants' failure to keep Dickson off the Church premises or to provide Harrison with reasonable security demonstrated "malice" within the meaning of Civil Code section 3294.

The trial court sustained the demurrers without leave to amend. Regarding the wrongful death and negligence claims, it concluded that defendants did not owe a legal duty to Harrison to provide additional or personal security or to ban Dickson from the premises. The court determined that the allegations in the first amended complaint failed to show "that there was a heightened foreseeability" that "Dickson was going to commit a brutal criminal act by murdering [Harrison]" in the Church parking lot. The court further found that "the proposed security measures are vague ('additional or personal security'), burdensome (security guard in parking lot), and lack efficacy against a person who violates a restraining order." The court likewise concluded that English failed to allege facts sufficient to

7

support her other causes of action against the Ministry defendants.

The trial court also granted the Ministry defendants' motions to strike the punitive damages claims, concluding that the first amended complaint failed to allege anything rising "to the level of oppression, fraud, or malice." The court also cited the absence of any order pursuant to Code of Civil Procedure section 425.14 authorizing English to pursue punitive damages claims against the Ministries.

The court thereafter entered a judgment of dismissal in favor of the Ministry defendants. English timely appealed.

## DISCUSSION

English contends the trial court erred by concluding that the Ministry defendants did not owe Harrison a legal duty to protect her from Dickson's violent attack. In particular, English argues the Ministry defendants were liable for Harrison's murder "as a result of inadequate security at the Church," and their failure "to disinvite a congregant known to have committed" violence against Harrison in the past. According to English, the allegations in the first amended complaint demonstrated that the Ministry defendants knew about Dickson's violent propensities and that his attack of Harrison at the Church was foreseeable. She emphasizes that two months prior to Harrison's murder, Dickson told Smith that Harrison had accused Dickson of choking her; that the Ministry defendants knew Harrison had a restraining order against Dickson; and that the Ministry defendants knew Dickson had harassed Harrison at the Church and had prepared a report indicating they " 'had to look out for the two of them having problems.' "

8

On appeal, English also offers the following additional allegations which she contends cure any defects with the first amended complaint. The Ministry defendants knew that "Dickson was not actually attending any of the functions or services at the Church around the time he killed Harrison, but that rather he was only showing up at the Church at certain times because he knew he would be able to see Harrison and would act violently or erratically at best, i.e., the Church knew in advance Dickson was stalking Harrison and did nothing." For example, the Ministry defendants knew that Dickson would "often visit the youth services department of the Church because he knew Harrison volunteered with children" at the Church. The Ministry defendants also knew that Dickson had "stolen Harrison's phone so he could look through her private photos and texts at the Church property—a guard . . . had to force Dickson to give it back."

Also, prior to Harrison's murder the Ministry defendants had "arranged for their security staff to keep families separated while at the Church, in cases of custody disputes, harassment, or divorce."

On the day of Harrison's murder, a Church security guard sent Harrison a text message telling her to park her car "in the location where she was killed because, he said, that area of the parking lot would be monitored" by security guards. After Harrison's murder, Smith and/or Jones told a Church security guard that they had discussed "disinviting Dickson from the premises prior to the attack because they knew he was a danger to Harrison."

9

## I.    Demurrer

### A.    Standard of review

"We review a judgment of dismissal after an order sustaining a demurrer de novo, exercising our independent judgment about whether the complaint states a cause of action as a matter of law.  [Citation.]  We 'assume the truth of all facts properly pleaded by the plaintiffs, as well as those that are judicially noticeable.'  [Citation.]  'We may affirm on any basis stated in the demurrer, regardless of the ground on which the trial court based its ruling.' " (*Hanouchian, supra,* 51 Cal.App.5th at p. 106.)

"It is an abuse of discretion to sustain a demurrer without leave to amend if there is a reasonable probability that the defect can be cured by amendment.  [Citation.]  The burden is on the plaintiff to demonstrate how the complaint can be amended to state a valid cause of action.  [Citation.]  The plaintiff can make that showing for the first time on appeal." (*Chapman v. Skype, Inc.* (2013) 220 Cal.App.4th 217, 226.)

### B.    Applicable legal principles

"To establish a cause of action for negligence, the plaintiff must show that the 'defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.'  [Citation.]  Recovery for negligence depends as a threshold matter on the existence of a legal duty of care."[3]  (*Brown, supra,* 11 Cal.5th at p. 213.)  "The

_____

[3]    English's appeal addresses only whether the Ministry defendants owed Harrison a legal duty to prevent Dickson's assault, contending that her other causes of action "flow from

10

existence of a duty is a question of law for the court." (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674 (*Ann M.*), disapproved on other grounds in *Reid v. Google* (2010) 50 Cal.4th 512, 527, fn. 5.)

"In general, each person has a duty to act with reasonable care under the circumstances. [Citations.] However, 'one owes no duty to control the conduct of another, nor to warn those endangered by such conduct.' [Citation.] 'A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act.' " (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619 (*Regents*); *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235 (*Delgado*) ["A defendant may owe an affirmative duty to protect another from the conduct of third parties if he or she has a 'special relationship' with the other person."].)

Our Supreme Court has instructed us to apply a two-step inquiry to determine "whether a defendant has a legal duty to take action to protect the plaintiff from injuries caused by a third party." (*Brown*, *supra*, 11 Cal.5th at p. 209.) "First, the court must determine whether there exists a special relationship between the parties or some other set of circumstances giving rise to an affirmative duty to protect. Second, if so, the court must consult the factors described in *Rowland* [*v. Christian* (1968) 69

---

[her] negligence claim." Thus, we do not separately analyze whether any other cause of action in English's first amended complaint states a claim for relief.

Cal.2d 108] to determine whether relevant policy considerations counsel limiting that duty."[4] (*Ibid*.)

The two-step inquiry is based on the premise that "even when two parties may be in a special relationship, the unforeseeability of the kind of harm suffered by the plaintiff or other policy factors may counsel against establishing an affirmative duty for one party to protect another." (*Brown*, *supra*, 11 Cal.5th at p. 219.) "A court might conclude that duty should not be imposed because, for example, the type of harm the plaintiff suffered was unforeseeable, or because there was no moral blameworthiness associated with defendant's conduct, notwithstanding the defendant's special relationship to the plaintiff. Put differently, even when a special relationship gives rise to an affirmative duty to protect, a court must still consider whether the policy considerations set out in *Rowland* warrant a departure from that duty in the relevant category of cases." (*Id*. at p. 222.)

The Ministry defendants do not dispute that the first amended complaint adequately alleges the existence of a special relationship between the Ministries and Harrison. Indeed, " '[t]he relationship between a possessor of land and an invitee is a special relationship giving rise to a duty of care.' [Citations.] 'The duty of care includes a duty to take reasonable steps to protect persons on the property from physical harm caused by the foreseeable conduct of third parties,' including foreseeable

---

[4] *Rowland v. Christian*, *supra*, 69 Cal.2d 108, was partially superseded by statute on a different issue as stated in *Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 722, disapproved on other grounds in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853.

criminal acts." (*Hanouchian, supra,* 51 Cal.App.5th at p. 107; see *Delgado, supra,* 36 Cal.4th at p. 235 ["Courts have found such a special relationship in cases involving the relationship between business proprietors such as shopping centers, restaurants, and bars, and their tenants, patrons, or invitees."]; *Ann M., supra,* 6 Cal.4th at p. 674 [landlord owes duty to tenants and patrons "to take reasonable steps to secure common areas against foreseeable criminal acts of third parties that are likely to occur in the absence of such precautionary measures."].)

 As do the parties, we therefore focus our analysis on the second step of the two-step inquiry established by *Brown*. At that step, we determine a duty's existence and scope by applying the *Rowland* factors: " '[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Ann M., supra,* 6 Cal.4th at p. 675, fn. 5, quoting *Rowland v. Christian, supra,* 69 Cal.2d at p. 113; see *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213 (*Castaneda*).) "Foreseeability and the extent of the burden to the defendant are ordinarily the crucial considerations, but in a given case one or more of the other *Rowland* factors may be determinative of the duty analysis." (*Castaneda,* at p. 1213.)

 "With respect to the two most crucial considerations, our Supreme Court has instructed that ' "the scope of the duty is determined in part by balancing the foreseeability of the harm

against the burden of the duty to be imposed.  [Citation.]  ' "[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required.  [Citation.]  On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required." ' " ' " (*Hanouchian*, *supra*, 51 Cal.App.5th at p. 108.)  "The high court has described this analysis as a 'sliding-scale balancing formula.' " (*Ibid*.)

The duty analysis requires us "to identify the specific action or actions the plaintiff claims the defendants had a duty to undertake.  'Only after the scope of the duty under consideration is defined may a court meaningfully undertake the balancing analysis of the risks and burdens present in a given case to determine whether the specific obligations should or should not be imposed on the landlord.' " (*Castaneda, supra*, 41 Cal.4th at p. 1214.)  Thus, " '[f]irst, the court must determine the specific measures the plaintiff asserts the defendant should have taken to prevent the harm.  This frames the issue for the court's determination by defining the scope of the duty under consideration.  Second, the court must analyze how financially and socially burdensome these proposed measures would be to a landlord, which measures could range from minimally burdensome to significantly burdensome under the facts of the case.  Third, the court must identify the nature of the third party conduct that the plaintiff claims could have been prevented had the landlord taken the proposed measures, and assess how foreseeable (on a continuum from a mere possibility to a reasonable probability) it was that this conduct would occur.  Once the burden and foreseeability have been independently

14

assessed, they can be compared in determining the scope of the duty the court imposes on a given defendant.' " (*Ibid*.)

### C. The trial court properly sustained the demurrers of the Ministry defendants

English's first amended complaint alleged that the Ministry defendants had a duty to "provide increased security," to provide "additional or personal security," and to post a "security detail in the Church's parking lot to ensure that parishioners like [Harrison] were able to enter their house of worship free of harassment and violence." Her first amended complaint further alleged that the Ministry defendants had a duty to "ban[] [Dickson] from [the] Church premises." We examine each proposed duty in turn, and conclude that the Ministry defendants were not required to undertake these duties.[5]

In doing so, we have considered both the allegations in the first amended complaint and those English raises on appeal. We therefore do not separately analyze whether English should be granted leave to amend her first amended complaint, as we conclude that the new allegations she raises on appeal are insufficient to cure the deficiencies in her first amended complaint.

---

[5] Because we affirm the trial court's decision sustaining the Ministry defendants' demurrers on the merits, we need not address their argument that judgment should be affirmed due to English's purported failure to analyze how the cases she cites apply to her arguments.

15

### 1. Duty to provide additional security guards

Our analysis of English's claim that the Ministry defendants had a duty to provide additional security guards, including posting security guards in the Church parking lot, is guided by California Supreme Court cases examining a landlord's duty to provide security guards to protect against third party violence. As explained below, these cases have concluded that because the duty to provide security guards imposes a significant burden, a heightened degree of foreseeability of third party criminal conduct is necessary to impose such a duty.

In *Ann M.*, the plaintiff was an employee of a photo business located in a shopping center who was sexually assaulted at work by a man armed with a knife. (*Ann M.*, *supra*, 6 Cal.4th at p. 671.) The plaintiff sued the shopping center for negligence, contending that the attack was a foreseeable result of the shopping center's failure to provide security patrols to deter the presence of transients in common areas of the shopping center. (*Id*. at p. 673.) The trial court granted summary judgment in favor of the shopping center on the basis that it owed no such duty to the plaintiff. (*Ibid*.)

On appeal, our Supreme Court concluded that "[w]hile there may be circumstances where the hiring of security guards will be required to satisfy a landowner's duty of care, such action will rarely, if ever, be found to be a 'minimal burden.' The monetary costs of security guards is not insignificant. Moreover, the obligation to provide patrols adequate to deter criminal conduct is not well defined. 'No one really knows why people commit crime, hence no one really knows what is "adequate" deterrence in any given situation.' " (*Ann M.*, *supra*, 6 Cal.4th at

16

p. 679.). *Ann M.* thus held that "a high degree of foreseeability is required in order to find that the scope of a landlord's duty of care includes the hiring of security guards," and stressed further that "the requisite degree of foreseeability rarely, if ever, can be proven in the absence of prior similar incidents of violent crime on the landowner's premises." (*Ibid.*)

The California Supreme Court examined a similar issue in *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1191 (*Sharon P.*), disapproved on other grounds in *Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at page 853, footnote 19, and *Reid v. Google, Inc.*, *supra*, 50 Cal.4th at page 527, footnote 5. There, the plaintiff was sexually assaulted in an underground parking garage below her office building. (*Id.* at p. 1185.) She sued the garage owner and the garage parking service alleging that their "failure to provide adequate security for users of the parking garage resulted in" her attack. (*Ibid.*)

In affirming summary judgment in favor of the defendants, the California Supreme Court emphasized its conclusion in *Ann M.* that "in light of the vagueness of the obligation to provide patrols adequate to deter crime and the significant monetary and social costs that are implicated in imposing such an obligation, a 'high degree of foreseeability' is required in order to find that the scope of a landowner's duty of care includes the hiring of security guards to protect against violent crime by third parties." (*Sharon P.*, *supra*, 21 Cal.4th at p. 1190.) Applying that analysis, our Supreme Court concluded that the plaintiff failed to provide evidence of prior crimes in the area that were sufficiently like the plaintiff's assault to "establish a high degree of foreseeability that would justify the imposition" of a duty by defendants to "provide security guards in their garage." (*Id.* at p. 1191.) It likewise

17

questioned whether other measures suggested by the plaintiff, including periodic walk-throughs of the garage by security personnel, were less burdensome, and applied the same heightened foreseeability test: "[A]bsent any prior similar incidents or other indications of a reasonably foreseeable risk of violent criminal assaults in that location, we cannot conclude defendants were required to secure the area against such crime." (*Id*. at pp. 1195–1199.)

*Delgado* reaffirmed this approach to examining whether to impose a duty to provide security guards. There, the plaintiff, a bar patron who was attacked in the parking lot of the bar by a group of fellow patrons, sued the bar for negligence. (*Delgado*, *supra*, 36 Cal.4th at pp. 230–231.) The bar employed two security guards, one posted inside the bar and the other outside in the parking lot. (*Id*. at p. 230.) The plaintiff and his wife became uneasy after several bar patrons began staring at them, and before leaving the bar the plaintiff's wife informed the security guard that " 'there was going to be a fight.' " (*Id*. at p. 231.) The security guard inside the bar did not escort them to their car, and the security guard normally posted outside was no longer present when the plaintiff was assaulted in the parking lot. (*Ibid*.)

On appeal from a verdict in favor of the plaintiff, the bar contended that in the absence of any evidence of prior similar criminal assaults on the premises or in the vicinity, it had no duty to provide a security guard to protect the plaintiff from the assault. (*Delgado, supra*, 36 Cal.4th at p. 232.) On that point, the California Supreme Court agreed. After discussing *Ann M.* and *Sharon P.*, it reaffirmed that "only when 'heightened' foreseeability of third party criminal activity on the premises

18

exists—shown by prior similar incidents or other indications of a reasonably foreseeable risk of violent criminal assaults in that location—does the scope of a business proprietor's special-relationship-based duty include an obligation to provide guards to protect the safety of patrons." (*Id.* at p. 240, italics omitted.) Concluding the plaintiff produced no such evidence, *Delgado* held that the bar did not have "an obligation to provide any guard, or additional guards, to protect against third party assaults." (*Id.* at 245.)

English's first amended complaint variously describes the duty she seeks to impose on the Ministry defendants as providing "increased security to members of their congregation," "taking additional precautions to provide for [Harrison's] security while she was on Church premises," "posting [a] security detail in the Church's parking lot to ensure that parishioners like [Harrison] were able to enter their house of worship free of harassment and violence," and providing "personal security." Regardless of how English specifically characterizes this duty, it seems clear it centers around providing security guards to protect parishioners like Harrison. We therefore find that the duty English seeks to impose here is no less burdensome or vague than the duty at issue in *Ann M.*, *Sharon P.*, and *Delgado*.[6] (See *Delgado*, *supra*,

---

[6] English's opening brief acknowledges that requiring a landowner to provide security guards potentially imposes a significant burden. We do not believe that duty is any less burdensome here even if we account for the allegation in the first amended complaint that the Church had a 15-person security staff and English's claim on appeal that the Ministry defendants had previously "arranged for their security staff to keep families separated while at the Church, in cases of custody disputes,

36 Cal.4th at pp. 238–240; *Sharon P., supra*, 21 Cal.4th at p. 1190 [noting "the vagueness of the obligation to provide patrols adequate to deter crime and the significant monetary and social costs" implicated in imposing such an obligation]; *Ann M., supra*, 6 Cal.4th at p. 679 [observing that "the hiring of security guards" "will rarely, if ever, be found to be a 'minimal burden' " and that "the obligation to provide patrols adequate to deter criminal conduct is not well defined"]; see also *Melton v. Boustred* (2010) 183 Cal.App.4th 521, 539 ["The California Supreme Court has repeatedly found 'the burden of hiring security guards' to be 'extremely high.' "].)

English's failure to define precisely what sort of additional security guards would have been adequate to deter the type of violent attack suffered by Harrison is emblematic of the problems with imposing such a legal duty in the first place. As California cases have repeatedly recognized in evaluating a landowner's duty to prevent criminal acts, identifying adequate measures to protect against criminal conduct is difficult at best. (See *Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138,

---

harassment, or divorce." A similar situation was presented in *Delgado*. At the time the plaintiff was attacked in the bar parking lot, the bar employed security staff and had instructed security to "patrol the parking lot outside the bar to ensure that persons did not congregate or consume intoxicating beverages there." (*Delgado, supra*, 36 Cal.4th at p. 230.) The California Supreme Court continued to treat the duty to hire security guards as a "burdensome" one and did not indicate that the burden was any less given the fact that the bar already employed security. (See *id.* at pp. 241, 244–245.) We therefore treat the duty to provide security guards as burdensome, even accounting for the Church's existing security staff.

1150 (*Wiener*) ["[I]f a criminal decides on a particular goal or victim, it is extremely difficult to remove his every means for achieving that goal."]; *Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 283 [" '[H]ow can one know what measures will protect against the thug, the narcotic addict, the degenerate, the psychopath and the psychotic?' "]; *Pamela W. v. Millsom* (1994) 25 Cal.App.4th 950, 959 ["On the facts of this case, involving what appeared to be an attack by someone who had stalked the victim, it is wholly unclear what level of security short of armed guards could have been fully relied upon to prevent the crime."]; *7735 Hollywood Blvd. Venture v. Superior Court* (1981) 116 Cal.App.3d 901, 905 ["No one really knows why people commit crime, hence no one really knows what is 'adequate' deterrence in any given situation."].)

Because the duty to maintain security guards adequate to have prevented Harrison's attack imposes a significant burden on the Ministry defendants and is vague, English must point to allegations in the first amended complaint that sufficiently allege a high degree of foreseeability of third party criminal conduct at the Church premises. (See *Ann M.*, *supra*, 6 Cal.4th at p. 679.) However, the first amended complaint does not allege any prior similar incidents at the Church or its parking lot, the key indicator of heightened foreseeability required to establish a duty to provide security guards. (See *Delgado*, *supra*, 36 Cal.4th at p. 240; *Sharon P.*, *supra*, 21 Cal.4th at p. 1191; *Ann M.*, at p. 679 ["requisite degree of foreseeability rarely, if ever, can be proven in the absence of prior similar incidents of violent crime on the landowner's premises"]; *Melton v. Boustred*, *supra*, 183 Cal.App.4th at pp. 537–538 ["[I]n cases involving liability for third party criminal conduct, 'the requisite degree of

21

foreseeability rarely, if ever, can be proven in the absence of prior similar incidents.' "].)

That leaves English having to show that the first amended complaint sufficiently alleges another indication of a highly foreseeable risk of violent criminal assault at the Church or its parking lot.[7] (See *Wiener, supra,* 32 Cal.4th at pp. 1151–1152 [acknowledging that "some types of crime might be foreseeable without prior similar incidents"]; *Delgado, supra,* 36 Cal.4th at p. 240 [" 'heightened' foreseeability" can be shown by "prior similar incidents or other indications of a reasonably foreseeable risk of violent criminal assaults in that location"]; *Margaret W. v. Kelley R.* (2006) 139 Cal.App.4th 141, 155 [" 'heightened foreseeability' " requires "knowledge of the perpetrator's propensity to assault or knowledge of prior similar incidents in

<hr />

[7] English contends the Ministry defendants mistakenly rely on cases involving a "random" criminal act such as *Hanouchian*. (See, e.g., *Hanouchian, supra,* 51 Cal.App.5th at pp. 104–105 [plaintiff attacked " 'suddenly, and without any provocation' " by other partygoers unknown to plaintiff].) *Ann M., Sharon P.,* and *Delgado* likewise involved assailants who were unknown to their victims. English argues this case, by contrast, involves a targeted attack by someone who was "prone to violence against a particular decedent," i.e., Harrison. (See, e.g., *Barber v. Chang* (2007) 151 Cal.App.4th 1456, 1466 ["the foreseeability question here does not involve the prospect of 'endemic' [citation] violence generally or a universe of 'unknown assailants' " but instead "a particular tenant identified as a threat"].) Although we acknowledge that distinction, because of the burdensome nature of the duty English seeks to impose on the Ministry defendants, we must still determine based on *Ann M.* and its progeny whether a violent attack at the Church or its parking lot was highly foreseeable under the circumstances presented here.

that location"].)  According to English, the allegations in the first amended complaint together with the new allegations she raises on appeal show the Ministry defendants knew about Dickson's propensity for violent behavior towards Harrison, and thus establish the requisite degree of heightened foreseeability of a violent incident at the Church premises.[8]

We disagree.  The first amended complaint vaguely alleges an undated prior incident where Dickson "was harassing [Harrison] at the Church while she was volunteering," and that "a report was made" to the Ministry defendants that they " 'had to look out for the two of them having problems.' "  That alleged incident, vague as it is and apparently not involving violence or

---

[8]    English's focus on the foreseeability of Dickson's attack against Harrison appears at odds with caselaw instructing that "a court's task—in determining 'duty'—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 572 fn. 6; see also *Regents, supra*, 4 Cal.5th at pp. 629–630; *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 774–775; *Vasquez v. Residential Investments, Inc., supra*, 118 Cal.App.4th at p. 286 ["foreseeability depends not on whether a particular plaintiff's injury was foreseeable as a result of a particular defendant's conduct, but instead on whether the conduct at issue created a foreseeable risk of a ' "particular kind of harm" ' "].)  We need not resolve that tension because even if we assume that English appropriately focuses on the foreseeability of Dickson's attack on Harrison, we conclude that Dickson's violent attack of Harrison in the Church parking lot was not highly foreseeable.

23

the threat of violence, fails to suggest, let alone make it highly foreseeable, that Dickson would violently attack Harrison at the Church. That remains so even coupled with the proposed new allegations on appeal that prior to Harrison's murder Dickson took Harrison's phone while the two were at Church to look through her photos, and had shown up to Church functions and services "because he knew he would be able to see" Harrison.[9] These new allegations likewise do not involve violence or the threat of violence, and thus similarly fail to show that it was highly foreseeable that Dickson would violently attack Harrison in the Church parking lot. Our conclusion is buttressed by the absence of allegations in the first amended complaint or on appeal that following Dickson's harassment of Harrison, Harrison feared for her safety at the Church or had asked the

---

[9] According to English's proposed new allegations, Dickson was "only showing up at the Church at certain times because he knew he would be able to see Harrison *and would act violently or erratically at best*, i.e., the Church knew in advance Dickson was stalking Harrison and did nothing." The conclusory allegation that Dickson "would act violently or erratically" while at a Church service or function is not supported by any specific factual allegations. We therefore do not rely on it. (See *Hanouchian, supra,* 51 Cal.App.5th at p. 103 [on review of sustaining of demurrer we " 'treat as true all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law' "]; *Megeff v. Doland* (1981) 123 Cal.App.3d 251, 259 [disregarding conclusory allegations in complaint in evaluating duty to prevent violent attack].) We also do not rely on the conclusory allegation in the first amended complaint that the Ministry defendants had received "numerous warnings . . . from fellow parishioners" regarding Dickson, as it likewise is not supported by any specific factual allegations.

24

Ministry defendants to take precautions to protect her from Dickson while on the Church premises.

Nor are we convinced that English demonstrates the requisite degree of heightened foreseeability with the allegations in the first amended complaint that two months before her murder, "Dickson admitted to Smith that [Harrison] had accused him of 'choking her out' and that the authorities had to be called," resulting in a restraining order against Dickson. Although this incident involved violence by Dickson, the allegation provides no detail about the circumstances surrounding the incident to suggest that further violence by Dickson was likely, let alone that it was highly foreseeable he would brutally murder Harrison in the Church parking lot two months later. (See *Wiener, supra*, 32 Cal.4th at p. 1150 ["[I]t is difficult if not impossible in today's society to predict when a criminal might strike."]; *Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1194, 1211–1212 [affirming nonsuit and holding that verbal and physical altercation between patrons at restaurant, including "a pushing and shoving match" and one patron "punching [another] in the face," did not make subsequent shooting of one patron by another inside the restaurant foreseeable]; *compare Barber v. Chang, supra*, 151 Cal.App.4th at pp. 1460, 1466–1467 [harm to plaintiff foreseeable where landlord knew that on prior occasion tenant aimed shotgun at plaintiff's wife, yelled " 'leave my family alone,' " and told wife to " ' "[b]ring [plaintiff] here" ' "]; *Madhani v. Cooper* (2003) 106 Cal.App.4th 412, 415–416 [foreseeability of harm "clear" where landlord knew tenant had "engaged in repeated acts of assault and battery" against plaintiff and her mother and received "at least six reports of [tenant's] violent and threatening behavior"].) Again, we note that English does not

25

allege in her first amended complaint or on appeal that Harrison alerted the Ministry defendants to the choking incident or restraining order, that Dickson had subsequently threatened Harrison with violence, that the Ministry defendants witnessed any violent or threatening conduct by Dickson, that Harrison feared further violence by Dickson, or that following the incident Harrison had asked the Ministry defendants to take precautions to protect her from Dickson while on the Church premises.

English raises two more allegations on appeal that she contends made Dickson's violent attack at the Church highly foreseeable. First, on the day of Harrison's murder, a Church security guard told "her to park in the location where she was killed because, he said, that area of the parking lot would be monitored by" security.[10] Second, the Ministry defendants considered disinviting Dickson "from the premises prior to the attack because they knew he was a danger to Harrison."

Given the absence of allegations supporting the conclusion that Dickson's violent attack of Harrison in the Church parking lot was highly foreseeable, that the Ministry defendants considered taking precautions to protect Harrison does not transform an otherwise unforeseeable violent act into a highly foreseeable one. As our high court emphasized in *Delgado*, "[c]ontrary to the suggestion that 'the issue of foreseeability becomes irrelevant' whenever a proprietor has employed a security guard [citation], the foreseeability of the criminal

---

[10] English does not discuss the doctrine of negligent undertaking or explain how it would apply here. (See *Hanouchian*, *supra*, 51 Cal.App.5th at pp. 114–115 [discussing negligent undertaking theory].) We therefore do not address it.

conduct in question remains relevant to the existence and scope of a proprietor's duty under the special relationship doctrine." (*Delgado*, *supra*, 36 Cal.4th at p. 248; see also *id*. at p. 249 ["Merely because a supermarket or other similar enterprise 'chooses to have a security program' that includes provision of a roving security guard does not signify that the proprietor has assumed a duty to protect invitees from third party violence."]) To hold otherwise might deter landowners and proprietors from taking reasonable measures to protect tenants, invitees, and patrons; taking such measures would result in a duty of care to safeguard against otherwise unforeseeable criminal acts on their property.

Finally, English does not point to any allegations in the first amended complaint or on appeal suggesting the Ministry defendants knew Dickson's attack of Harrison was imminent, or that they failed to reasonably assist Harrison once they became aware of Dickson's violent assault in the Church parking lot. Thus, this case does not involve the duty to assist an invitee facing "danger from imminent or ongoing criminal assaultive conduct occurring upon the premises." (*Morris v. De La Torre* (2005) 36 Cal.4th 260, 270; see *Delgado*, *supra*, 36 Cal. 4th at pp. 245–247 [discussing bar's "duty to respond to events unfolding in its presence by undertaking reasonable, relatively simple, and minimally burdensome measures"]; *Marois v. Royal Investigation & Patrol, Inc.* (1984) 162 Cal.App.3d 193, 201–202 [triable issue of fact regarding security guards' duty to intervene in ongoing physical altercation].) Rather, English's appeal focuses on the "duty to provide security guards or other similarly burdensome measures designed to prevent future criminal

conduct," which requires a showing of heightened foreseeability. (*Morris v. De La Torre, supra,* 36 Cal.4th at p. 270.)

Because English has failed to allege sufficient facts to establish the high degree of foreseeability necessary to charge the Ministry defendants with the duty to provide security guards, "we need not consider the other *Rowland* factors." (*Hanouchian, supra,* 51 Cal.App.5th at p. 113.)

### 2. Duty to exclude Dickson from the Church premises

We are likewise unpersuaded that the allegations in the first amended complaint or those English raises on appeal support the conclusion that the Church had a duty to exclude Dickson from the premises. We analyze this proposed duty under the same principles described above, primarily by balancing the " 'foreseeability of the harm against the burden of the duty to be imposed.' " (*Hanouchian, supra,* 51 Cal.App.5th at p. 108; see *Castaneda, supra,* 41 Cal.4th at p. 1214.)

Although English has not discussed a case involving a duty to ban a purportedly violent patron or invitee, we find *Castaneda* instructive. There, the plaintiff, shot while he was a bystander to a gang confrontation involving the residents of a mobilehome across the street from the plaintiff's mobilehome, sued the owner of the mobilehome park. (*Castaneda, supra,* 41 Cal.4th at p. 1209.) The plaintiff alleged the owner had a duty to evict the residents involved in the gang confrontation "once they began to harass and annoy other residents of the park." (*Id.* at p. 1219.)

The California Supreme Court affirmed nonsuit in favor of the owner, analyzing the plaintiff's claim under the principles of *Ann M.* and related cases. (*Castaneda, supra,* 41 Cal.4th at pp. 1213–1214 [discussing *Ann M., Delgado, Sharon P.,* and

28

*Rowland*].)  It concluded that "undertaking eviction of a tenant cannot be considered a minimal burden," noting that the expense of eviction proceedings "is not necessarily trivial," and that "undertaking eviction of a hostile tenant, especially one involved in a violent street gang, could subject the landlord or property manager to retaliatory harassment or violence."  (*Id*. at p. 1219.) In light of those burdens, our high court looked "to the circumstances of this case to see if [the mobilehome park owner] was on notice of facts making a gang shooting" involving the residents "highly foreseeable."  (*Id*. at pp. 1220–1221.)

Unlike *Castaneda*, English contends that "disinvit[ing] Dickson as a member of the Church and keep[ing] him off the property" imposes a minimal burden on the Ministry defendants. She likewise implies it would have been a minimal burden for the Ministry defendants "to impose some sort of separation policy" to keep Dickson away from Harrison.

Even assuming the Church could have easily "disinvited" Dickson as a member, keeping him off the Church premises would not have imposed a minimal or trivial burden.  As noted already, it is unclear what level of reasonable protective measures would be adequate to protect someone against a determined violent criminal.  (See *Wiener, supra*, 32 Cal.4th at p. 1150; *Vasquez v. Residential Investments, Inc., supra,* 118 Cal.App.4th at p. 283; *Pamela W. v. Millsom, supra*, 25 Cal.App.4th at p. 959; *7735 Hollywood Blvd. Venture v. Superior Court, supra*, 116 Cal.App.3d at p. 905.)  Dickson's disregard of the restraining order against him underscores that point; tragically, it did nothing to stop him from confronting and fatally attacking Harrison in the Church parking lot.  We thus fail to see

29

how a "separation policy" imposed by the Church would have been any more effective.

The Ministry defendants therefore understandably emphasize that a landlord would have to take substantial measures to fortify itself—for example, constant monitoring of entrances, hiring security guards to patrol the premises, or construction of fences or other barriers to control access to the property—to prevent a violent individual from entering its premises. Even for the Church, which employed a 15-person security staff and had previously "arranged for their security staff to keep families separated while at Church, in cases of custody disputes, harassment, or divorce", requiring it to undertake those measures would impose a considerable burden. (See *Vasquez v. Residential Investments, Inc.*, *supra*, 118 Cal.App.4th at p. 285 [court must analyze how financially burdensome proposed measures "would be to a landlord, which measures could range from minimally burdensome to significantly burdensome under the facts of the case"]; *compare Regents*, *supra*, 4 Cal.5th at p. 633 [finding that "record reflects that colleges have already focused considerable attention on identifying and responding to potential threats, and have funding sources available for those efforts"].)

In response to the Ministry defendants' argument, English counters that if the Ministry defendants had disinvited Dickson from the Church, they could have "instructed security staff to enforce this ban, call[ed] 911 immediately upon his arrival, or even responded to his presence with their security staff." Instead, the first amended complaint alleges that at the time of Dickson's attack of Harrison in the Church parking lot, Smith

was inside the Church's sanctuary area and "distracted from his duties by the imminent arrival of Jones."

English's attempt to hold the Ministry defendants liable for failing to take these steps presupposes that security guards were constantly monitoring the Church parking lot or tracking Harrison's whereabouts at the Church premises. They were not, at least according to the first amended complaint and the allegations English raises on appeal. And we have already rejected English's claim that the Ministry defendants had these duties as a matter of law. Finally, as noted above, English has not alleged that the Ministry defendants were aware of Dickson's presence at the Church parking lot but failed to call 911 or take other reasonable and minimally burdensome steps to separate him from Harrison. (See *Morris v. De La Torre, supra,* 36 Cal.4th at pp. 277–278; *Delgado, supra,* 36 Cal.4th at pp. 245–247; *Marois v. Royal Investigation and Patrol, Inc., supra,* 162 Cal.App.3d at pp. 201–202.) Sadly, by the time the Ministry defendants learned of the attack, it was too late to save Harrison.

Having concluded that the duty to ban and exclude Dickson from the Church premises is a significant burden, English must demonstrate that Dickson's attack of Harrison in the Church parking lot was highly foreseeable. (*Castaneda, supra,* 41 Cal.4th at pp. 1220–1221.) We have already addressed that issue and concluded it was not.

Thus, we do not address the remaining *Rowland* factors (*Hanouchian, supra,* 51 Cal.App.5th at p. 113), except to note that, in addition to the significant burdens on the Ministry defendants that would result from the duty English seeks to impose, we are also mindful of the potential social costs. (See *Regents, supra,* 4 Cal.5th at p. 633 [*Rowland* requires considering

31

burden "that recognizing a tort duty would impose on the defendant and the community"].) Churches and other houses of worship are normally open and welcoming places, not strongholds. Also, imposing the sort of duties English proposes here—banning and excluding parishioners who have acted violently against other parishioners in the past—could impair the relationship between parishioners and their religious community or religious leaders. (Cf. *Conti v. Watchtower Bible & Tract Society of New York, Inc.* (2015) 235 Cal.App.4th 1214, 1228–1229 [imposing duty on church to warn members when it "believe[s] that a congregation member is capable of doing harm" could "discourage wrongdoers from seeking potentially beneficial intervention" and "contravene the public policy against disclosure of penitential communications"].)

## II.    Motion to strike

English contends the trial court mistakenly struck from the first amended complaint the punitive damages allegations against the Ministry defendants.

Because we affirm the trial court's dismissal of the first amended complaint against the Ministry defendants without leave to amend, we need not address whether the first amended complaint sufficiently alleged punitive damages against the Ministry defendants. (See, e.g., *Morningstar, Inc. v. Superior Court* (1994) 23 Cal.App.4th 676, 697 ["Since we are sustaining the demurrer without leave to amend, we need not reach [defendant's] motion to strike [plaintiff's] request for punitive damages."].)

**DISPOSITION**

The judgment in favor of City of Refuge Ministries, Inc., Noel Jones Ministries, Inc., Noel Jones, and Bryant Smith is affirmed. They are entitled to their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                              EDMON, P. J.

We concur:

                    LAVIN, J.

                    NGUYEN, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.